IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DR. ABDELHALEEM ASHQAR,**                    Case No. 4:18 CV 1141

      Petitioner,                                 Judge Christopher A. Boyko

      v.                                          Magistrate Judge James R. Knepp, II

**CHRISTOPHER J. LAROSE, et al.,**

      Respondents.                                REPORT AND RECOMMENDATION

## INTRODUCTION

Petitioner Dr. Abdelhaleem Ashqar ("Petitioner"), an immigration detainee then in federal custody, filed a Petition for a Writ of Habeas Corpus 28 U.S.C. § 2241 ("Petition"). (Doc. 1). Respondents Christopher LaRose (Warden, Northeast Ohio Correctional Center), Rebecca Adducci, Detroit Field Office Director, United States Immigration and Customs Enforcement ("ICE")), Michael V. Bernacke (Chief, Removal International Operations Unit, ICE), Thomas D. Homan (Acting Director, ICE), and Kirstjen M. Nielsen (Secretary, United States Department of Homeland Security ("DHS")) filed a Response and Motion to Dismiss Improper Respondents. (Doc. 9).[1] Petitioner filed a Traverse (Doc. 10), and Respondents filed a Reply (Doc. 11). On November 7, 2018, the undersigned held an evidentiary hearing and took testimony. *See* Non-document entry dated November 7, 2018; Doc. 22 (transcript). The parties then filed status reports (Docs. 23, 24, 27), and Petitioner filed a renewed motion for discovery (Doc. 25), which Respondents opposed (Doc. 28), and Petitioner replied (Doc. 31). On December 21, 2018,

---

1. The undersigned recommended granting the Motion to Dismiss Improper Respondents in a Report and Recommendation dated March 4, 2019. (Doc. 35).

Respondents filed a Motion to Dismiss for Lack of Jurisdiction. (Doc. 30). On January 21, 2019, Petitioner filed an opposition (Doc. 32), and on February 15, 2019, Respondents filed their reply (Doc. 34).

The district court has jurisdiction over the Petition under § 2241(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Doc. 4). For the reasons discussed below, the undersigned recommends Respondents' Motion to Dismiss (Doc. 30) be granted and Petitioner's renewed discovery motion (Doc. 25) be denied as moot.

**BACKGROUND**

Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on May 17, 2018. (Doc. 1). In it, he alleged his detention pending removal violated 8 U.S.C. § 1231(a)(6) and the Substantive Due Process Clause under *Zadvydas v. Davis*, 533 U.S. 678 (2001) because his removal was not significantly likely in the reasonably foreseeable future. Petitioner sought release from custody, as well as an injunction preventing ICE re-detaining him without first establishing in this Court that his removal is reasonably foreseeable. (Doc. 1, at 14).

<u>Before Detention</u>

Petitioner is a Palestinian born in the West Bank. *See* Doc. 10-4 (Petitioner's Affidavit); Doc. 9-1, at 2 (August 7, 2018 Declaration of Michael Bernacke) (hereinafter "Bernacke Aug. Decl."). Neither Palestine, Israel, nor Jordan claim Petitioner as a citizen. *See id.* (Bernacke Aug. Decl.) (noting that each country had "denied ICE's requests for a travel document for Ashqar, as they do not believe him to be a citizen of their respective countries."); *see also* Doc. 1-3 (ICE Database listing Petitioner's "country of birth" as "Stateless").

2

Petitioner entered the United States on a J-1 visa in 1989. *See* Doc. 10-4 (Petitioner's Affidavit); Doc. 9-1, at 2 (Bernacke Aug. Decl.).[2]

In 1998, Petitioner was held in civil contempt for refusing to testify before a grand jury empaneled in the Southern District of New York about dealings with the terrorist organization Hamas. *See United States v. Ashqar*, 582 F.3d 819, 821 (7th Cir. 2009).

In 1999, Petitioner filed an asylum application; he attended hearings in immigration court in 1999 and 2000. (Doc. 9-1, at 2) (Bernacke Aug. Decl.).

On June 16, 2003, pursuant to a stipulated request for removal order and waiver of hearing, an immigration judge ordered Petitioner removed to Jordan. (Doc. 1-10); *see also* Doc. 9-1, at 2 (Bernacke Aug. Decl.); Doc. 1-9 (letter from ICE counsel confirming terms of agreement and stipulation).

On June 25, 2003, Petitioner was called to testify before a federal grand jury empaneled in the Northern District of Illinois, again regarding Hamas. *Ashqar*, 582 F.3d at 821. Petitioner refused to testify, and, as a result, was convicted in 2007 of criminal contempt and obstruction of justice. *Id.*[3] Petitioner was sentenced to a total of 135 months' imprisonment. *Id.* at 822. The Seventh Circuit affirmed Petitioner's sentence. *See id.* at 825-26.

Petitioner completed his criminal sentence on June 13, 2017 and was transferred to ICE custody. *See* Doc. 9-1, at 2 (Bernacke Aug. Decl.); Doc. 1-4, at 2 (Bureau of Prisons Inmate Locator noting release date of June 13, 2017).

---

2. ICE asserts Petitioner was admitted again on a J-2 Visa in August 1993 (Doc. 9-1, at 2) (Bernacke Aug. Decl.); and Petitioner asserts he has never been on a J-2 Visa, and has lived in the United States continuously since his 1989 entry (Doc. 10-4) (Petitioner's Affidavit). It is unnecessary to resolve this factual dispute to decide the issues before the Court.

3. Petitioner was also charged with, but acquitted of, a racketeering charge. *See Ashqar*, 582 F.3d at 822.

<u>After Order of Removal</u>

On September 28, 2017, ICE conducted an initial post-order custody review ("POCR") of Petitioner's status. (Doc. 1-5). Mark J. Hamilton, ICE Deputy Field Office Director, issued a "Decision to Continue Detention" explaining:

> At this time we will not release you due in part to the following: *You have a final order of removal from the United States and ICE is activity working with the Embassy of Jordan to obtain a travel document for your removal.*

*Id.* (emphasis in original). The letter then stated that if Petitioner was not released or removed by December 9, 2017, jurisdiction of the custody decision would be transferred to the ICE Headquarters Post Order Review Unit in Washington, D.C. *Id.*

On October 31, 2017, the Embassy of Jordan wrote a letter to ICE stating: "[A]ccording to the documents provided, Mr. Ashqar is not a Jordanian citizen. Mr. Ashqar has to provide more documents containing a national number to prove he is Jordanian, otherwise he cannot be deported to Jordan." (Doc. 1-11).

On January 9, 2018, Michael V. Bernacke, ICE Headquarters Removal and International Operations Unit Chief, issued a second "Decision to Continue Detention" explaining:

> You are a native and citizen of Palestine who last entered the United States on November 16, 1989, as a Non-Immigrant. A review of your criminal history reflects that you were convicted of the following offenses to include, Obstruction of Justice; Criminal Contempt and Racketeering. On June 16, 2003, you were issued a Final Order of Removal by an Immigration Judge (IJ).
>
> ICE is currently working with the government of Palestine to secure a travel document for your removal from the United States. A travel document from the Government of Palestine is expected, therefore you are to remain in ICE custody at this time.

(Doc. 1-6).

That same day Annette Joseph, an agent of ICE's Removal International Operations Unit, emailed Petitioner's deportation officer stating Petitioner was "ineligible for a Palestinian travel

document" because: 1) "Birth Certificate lacks I.D. #"; 2) "Subject possesses an Israeli I.D. # and the Israeli authorities continued to renew subject's I.D. document with the last renewal occurring in 1988"; 3) "Subject departed the territory in 1989." (Doc. 1-12). The email ends with: "Please seek removal to Israel." *Id.*

On April 13, 2018, Mr. Bernacke issued a third "Decision to Continue Detention" explaining:

> You are a native of Palestine citizen of Israel who last entered the United States on November 16, 1989, as a Non-Immigrant. A review of your criminal history reflects that you were convicted of the following offenses to include, Obstruction of Justice; Criminal Contempt and Racketeering. On June 16, 2003, you were issued a Final Order of Removal by an Immigration Judge.
>
> ICE is currently working with the government of Israel to secure a travel document for your removal from the United States. A travel document from the Government of Israel is expected, therefore you are to remain in ICE custody at this time.

(Doc. 1-7).

Five days later, on April 18, 2018, Mr. Bernacke issued a fourth "Decision to Continue Detention" which was identical to the one of April 13, except it eliminated the reference to a racketeering conviction. *See* Doc. 1-8.[4]

<u>After Initiation of Federal Court Habeas Proceedings</u>

On May 17, 2018, Petitioner filed the pending Petition. (Doc. 1).

On June 25, 2018, Mr. Bernacke issued a fifth "Decision to Continue Detention" explaining:

> You are a native of Palestine citizen of Israel who last entered the United States on November 16, 1989, as a Non-Immigrant. A review of your criminal history reflects that you were convicted of the following offenses to include, Obstruction of Justice and Criminal Contempt. On June 16, 2003, you were issued a Final Order of Removal by an Immigration Judge.

---

4. As noted above, Petitioner was charged with, but acquitted of, a racketeering charge. *See Ashqar*, 582 F.3d at 822.

ICE is currently working with the government of Israel to secure a travel document for your removal from the United States. A travel document from the Government of Israel is expected, therefore you are to remain in ICE custody at this time.

(Doc. 10-1).

At some point, the Embassy of Israel denied ICE's request for a travel document because Petitioner was not a citizen. *See* Doc. 9-1, at 2 (Bernacke Aug. Decl.). Further, "[t]he Government of Jordan affirmed their previous denial after ICE made a renewed request for travel documents." *Id.*

In July 2018, the Government re-submitted travel document requests to Israel and Palestine. (Doc. 11-1, at 1) (September 12, 2018 Declaration of Michael Bernacke) (hereinafter "Bernacke Sept. Decl."). Mr. Bernacke asserted that the Removal and International Operations Unit "will be engaging the Government of Israel in additional negotiations in the near future." *Id.*

In August, Mr. Bernacke asserted, *inter alia*, that:

5. [Enforcement and Removal Operations] generally submits travel document requests to the Embassies of Israel, Jordan, and the General Delegation of the Palestinian Liberation Organization to the U.S. in Washington, D.C. These requests consist of documents such as a travel document application, U.S. immigration documents, photographs of the alien, and identity documents, if available.

6. ICE has extensive experience removing criminal aliens to the above-mentioned locations. ICE routinely obtains travel documents from these entities via liaison efforts with embassy and consular staff.

(Doc. 9-1, at 1-2) (Bernacke Aug. Decl.). After summarizing Petitioner's case, and removal efforts made thus far, he further asserted:

10. ICE is revisiting travel document issuance with the Embassy of Israel and the General Delegation [of the Palestinian Liberation Organization]. I have personally re-submitted a travel document request to the Embassy of Israel, and I have engaged in specific discussions on this matter with high-level Embassy personnel. The Government of Israel is currently reviewing and considering the request. I will also be re-submitting a travel document request to the General Delegation of the Palestinian Liberation Organization to the U.S. and will schedule a meeting with

the General Delegation once Ashqar has provided the necessary travel document application materials. Therefore, requests for issuance for travel documents from these entities remain pending. Generally, an escalation of engagement at increasingly senior levels of ICE management and embassy staff results in positive outcomes for travel document issuance.

11. Additionally, during July 2018, ICE personnel in Tel Aviv, Israel, submitted the issue of obtaining travel documents to Ashqar to government officials in Israel and the Palestinian Territories who have the authority to permit Ashqar's removal. These in-country discussions are actively ongoing. ICE has also submitted a request for travel documents to the Government of Turkey, as Ashqar has voiced a preference to be removed to Turkey. The request to Turkey remains pending.

12. Based on my experience and the above considerations, in my professional opinion, Ashqar's removal from the United States is significantly likely in the reasonably foreseeable future.

*Id.* at 2-3.

In August 2018, Turkey denied the Government's request for a travel document for Petitioner. *Id.* And the Government no longer believed Jordan would accept Petitioner. *See* Doc. 11, at 3.

Throughout this process, Petitioner cooperated with the Government's attempts to obtain a travel document from various countries. Petitioner's wife and brother also made attempts to obtain travel documents from both Jordan and Turkey. *See* Doc. 10-2 (Declaration of Asmaa Ashqar); Doc. 10-3 (Declaration of Mouyyad Hassan Abdul Razzaq).

In October 2018, prior to the evidentiary hearing, Mr. Bernacke submitted a third declaration. (Doc. 18-1) (October 25, 2018 Declaration of Michael Bernacke) (hereinafter "Bernacke Oct. Decl."). Therein, Mr. Bernacke asserted that ICE had requests pending for a travel document from Palestine, and for permission from Israel to permit Petitioner to cross into the West Bank. *Id.*, at 1. Specifically, he asserted:

4. On August 27, 2018, the General Delegation of the Palestine Liberation Organization in Washington D.C. advised RIO that Ashqar would be issued a travel document to permit his removal to the West Bank. However, in September 2018,

the General Delegation was closed, eliminating RIO's liaison mechanism for removal matters within the United States.

5. Due to the General Delegation's closure, I instructed RIO officers that all removal-related issues be liaised with the Palestinian Authority in the West Bank, via the ICE's acting Assistant Attaché for Removal at the U.S. Embassy to Israel. On October 9, 2018, the acting Assistant Attaché discussed the travel document request with a high-ranking official with the Palestinian Authority with responsibility for issuing travel documents. On October 15, 2018, the acting Assistant Attaché again revisited the travel document request with a high-ranking official within the Palestinian Authority. On October 18, 2018, the official advised the acting Assistant Attaché that the Palestinian Authority had a record of an individual with Ashqar's name and that he would verify identity in order to issue a travel document. On October 18, 2018, the Palestinian Authority requested another copy of Ashqar's travel document packet, which includes photographs and his travel document application, and a letter from ICE affirming that the alien had concluded his legal obligations (i.e. criminal sentence, etc.), to assist with identification and travel document issuance. This information was routed by ICE's acting Assistant Attaché in Israel to the Palestinian Authority on October 19, 2018.

6. On October 16, 2018, representatives of the U.S. Department of State and RIO met with the Deputy Chief of Mission for the Embassy of Israel to the United States to discuss the U.S. government's pending request that Israel permit Ashqar to cross from Jordan into the West Bank over the Allenby Bridge, the location of an Israeli-controlled port-of-entry used to effectuate the return of ICE deportees to the Palestinian Territories. The Israel Deputy Chief of Mission advised that he would raise this request with his government to render a decision.

7. Crossing authorization requests are routed to the Government of Israel by ICE via the Embassy of Israel in Washington, D.C. These requests contain a copy of each alien's travel document request and a cover letter containing a summary of the alien's criminal and immigration history. Since I began supervising RIO, no crossing authorization request has been denied by Israel.

*Id.* at 1-2. Mr. Bernacke then again asserted that based on this information and his experience, he

believed "Ashqar's removal from the United States is significantly likely in the reasonably

foreseeable future." *Id.* at 2.

Also prior to the evidentiary hearing, Petitioner submitted a Declaration from Jonathan

Kuttab, an Israeli attorney. (Doc. 19-1). He asserted that, based on his knowledge and experience,

8

it was highly unlikely that the Government would be able to obtain the documents necessary to remove Petitioner to the West Bank. *Id.* at 5.

Evidentiary Hearing

Mr. Bernacke appeared and testified at a November 7, 2018 evidentiary hearing before the undersigned. (Doc. 22, at 12-47). At that time, Mr. Bernacke believed Petitioner's removal to be "imminent." *Id.* at 17. This was so because the day prior to the hearing, the Government paid a travel document fee to Palestine, and expected Palestine to issue Petitioner a travel document within "about a week". *Id.* Mr. Bernacke also testified that ICE submitted a request for authorization from Israel for Petitioner to cross the Allenby Bridge into the West Bank. *Id.* at 17-18. ("The government of Israel controls the bo[]rders in the region, to include the Allenby Bridge, which is the thoroughfare that we utilize to effectuate removals to the West Bank. And what we do is ask the Israelis if they will allow a certain number and specific individuals to be removed through that area. They will grant authorization and allow us to conduct those removals."). Mr. Bernacke expected to have a decision from Israel within 30 days of his last meeting with the Israeli Deputy Chief of Mission on October 16. *Id.* at 18. Additionally, Mr. Bernacke testified that the Jordanian government's approval was required to effectuate a removal in this manner. *Id.* at 21, 32. This is so because such a border crossing required a charter mission flight to land in Jordan to cross the Allenby Bridge into the West Bank. *Id.* at 21. Mr. Bernacke testified that typically the Government has received such authorization from Jordan within a week of such a request and "[i]t's never been an issue." *Id.*

Finally, Mr. Bernacke testified that the only reason for Petitioner's continued detention was a belief that Petitioner's removal was significantly likely in the reasonably foreseeable future. *Id.* at 22-23, 39.

Post-Hearing Developments

At the close of the hearing, the undersigned ordered the Government to submit a status report by December 7, 2018, detailing its progress toward removal. (Doc. 22, at 74). The Government did so, and in that report, stated it had "received all necessary permissions to remove Ashqar to the West Bank except for permission to transit through Jordan." (Doc. 23, at 1). In conjunction, Mr. Bernacke submitted a fourth declaration, stating, *inter alia*:

4. On November 14, 2018, RIO received notice from the Embassy of Israel in the United States that the Government of Israel had approved ICE's request for Ashqar's crossing into the West Bank over the Allenby Bridge to effectuate his removal to the West Bank.

5. On November 19, 2018, representatives of the Government of Jordan informed ICE and U.S. State Department personnel in Jordan that it was unilaterally terminating its Memorandum of Coordination (MOC) with ICE pertaining to Palestinian deportations through Jordan. Thus, the Jordanian Government's coordination with the U.S. on Palestinian removals through Jordan has been temporarily suspended.

6. ICE and U.S. State Department personnel are currently negotiating a new MOC with the Jordanian government that will allow for resumption of Palestinian deportations through Jordan. ICE personnel in Jordan have confirmed that at least one other country, within whom Jordan also terminated its MOC pertaining to Palestinian deportations, has already been able to establish a new MOC with Jordan and has resumed Palestinian deportations through Jordan.

7. On November 26, 2018, the Government of Jordan informed ICE personnel in Jordan that, separate from the termination of the MOC, it would not allow Ashqar to transit through Jordan.

8. On November 28, 2018, ICE personnel in Tel Aviv, Israel received notice from the Israeli Ministry of Foreign Affairs (MFA) that Israel will allow Ashqar to transit into the West Bank using a Certificate of Identity (Form I-269) issued by the ICE, regardless of whether the Palestinian Authority issues a travel document for Ashqar. On December 4, 2018, the MFA informed ICE officials in Israel that the Certificate of Identity submitted by ICE would be adequate to allow Ashqar to enter the Palestinian Territories (West Bank) via the Allenby Bridge. This approval does not include approval to fly into an Israeli airport; therefore, Ashqar's removal to the Palestinian Territories requires transit through Jordan.

9. ICE's request for a travel document issued by the Palestinian Authority remains outstanding. ICE personnel at the U.S. Embassy in Israel believe that, due to the escalation of tensions with Israel in the wake of rocket attacks from Gaza on November 11-12, 2018 and the potential for further military action, normal government operations have been seriously disrupted but that the appropriate authorities will address the travel document as soon as they are able. However, because Israel has finalized approval of the Certificate of Identity issued by ICE, a Palestinian travel document will not be necessary to effectuate Ashqar's removal to the West Bank.

10. After receiving notice that Jordan would not permit Ashqar to transit through Jordanian territory, ICE alerted senior leadership of DHS. ERO-RIO is aware that the Secretary of Homeland Security intends to discuss the subject of Ashqar's removal with senior officials in the Jordanian government. ERO-RIO and all other ICE personnel will engage counterparts in the Jordanian government following the Secretary's meetings and will secure prompt resolution of this issue.

(Doc. 23-1, at 1-3) (December 6, 2018 Declaration of Michael Bernacke) (hereinafter "Bernacke Dec. Decl."). Mr. Bernacke again stated that based on this information and his experience, "in [his] professional opinion, Ashqar's removal from the United States is significantly likely in the reasonably foreseeable future." *Id.* at 3.

The Government also submitted a Declaration from Dimple Shah, Assistant Secretary for International Affairs, Office of Strategy, Policy, and Plans within the Department of Homeland Security. (Doc. 23-2) (hereinafter "Shah Decl."). On December 6, 2018, Ms. Shah attested that she would accompany the Secretary of Homeland Security, Kirstjen Nielsen on a trip to Jordan that week and that "Secretary Nielsen will discuss the issue of ASHQAR's transit through Jordan with her counterparts at senior levels of the Jordanian government during her upcoming meetings in that country." (Shah Decl., Doc. 23-1, at 1). Moreover, Ms. Shah attested that DHS would "continue to engage counterparts at all appropriate levels of the Jordanian government to secure permission for Ashqar's transit through Jordan, and anticipates prompt discussions and resolution following Secretary Nielsen's meetings." *Id.* at 2.

11

Petitioner then submitted a response status report continuing to contest the likelihood of removal (Doc. 24), and Respondents submitted a reply (Doc. 27).

Nine days after filing their reply status report, on December 21, 2018, Respondents filed the pending Motion to Dismiss. (Doc. 30). In it, they represented that ICE had determined that Petitioner's removal is not significantly likely in the reasonably foreseeable future, and thus, Petitioner had been released from custody pursuant to an order of supervision. *Id.*; *see also* Doc. 30-2 (December 21, 2018 Declaration of Michael Bernacke); Doc. 30-2, at 3 (Release Notification). Petitioner filed an opposition (Doc. 32), and Respondents replied (Doc. 34).

### STANDARD OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) may take the form of either a facial or a factual attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Facial attacks challenge the sufficiency of the pleading itself. *Id.* Factual attacks, on the other hand, challenge the factual existence of subject-matter jurisdiction, regardless of what is or might be alleged in the pleadings. *Id.*

When adjudicating a motion to dismiss based upon a facial attack, the court must accept all material allegations of the complaint as true and must construe the facts in favor of the nonmoving party. *Ritchie*, 15 F.3d at 598 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974)); *see also Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001) (holding that all reasonable inferences must be drawn in favor of the plaintiff when evaluating a facial attack on subject-matter jurisdiction).

In contrast, a factual attack contests the validity of the facts alleged as support for subject-matter jurisdiction. *Ritchie*, 15 F.3d at 598. With a factual challenge, no presumption of truthfulness arises for either party, and the court must weigh the evidence to determine its power

12

to hear the case. *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). In this analysis, the court may consider both the pleadings and evidence not contained in the pleadings. *Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000).

### DISCUSSION

A federal district court may entertain an application for habeas relief only by a person held "in custody under or by color of the authority of the United States," or "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c) (1), (3); *see also Munaf v. Geren,* 553 U.S. 674, 685 (2008). An inmate in federal custody pending removal may challenge the constitutionality of his confinement pursuant to § 2241. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). The Supreme Court has held indefinite detention of a deportable alien is not permissible, as it would threaten the alien's Fifth Amendment's Due Process rights. *Id.* at 699.[5]

Mootness

Preliminarily, the burden of proving a matter has become moot falls upon the party claiming mootness—a burden the Supreme Court has described as "a heavy one." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

---

5. The Supreme Court in *Zadvydas* held that detention of an alien subject to removal due to a criminal conviction is presumptively reasonable for up to six months. 533 U.S. at 701. However, "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* "[F]or detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* "This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

The Supreme Court has also explained that, for a court to exercise habeas jurisdiction after release, a petitioner must demonstrate he was in custody at the time he filed the petition and his release did not render the petition moot. *Spencer v. Kemna,* 523 U.S. 1, 7 (1998). Because Petitioner was in custody at the time he filed his Petition, but is no longer, the question is whether this Court is still faced with a case or controversy under Article III, Section 2 of the Constitution. *Id.* A court determines whether an action is moot by "examining whether an actual controversy between the parties exists in light of intervening circumstances." *Fleet Aerospace Corp. v. Holderman,* 848 F.2d 720, 723 (6th Cir. 1988); *see also Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986) ("Mootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief.").

To have an existing case or controversy, Petitioner, throughout the litigation, "'must have suffered, or be[en] threatened with, an actual injury traceable to the [Respondent] and likely to be redressed by a favorable judicial decision.'" *Spencer*, 523 U.S. at 7 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). A district court generally lacks jurisdiction over a petitioner's habeas claim under 28 U.S.C. § 2241 if the petitioner is not in custody. *See Prieto v. Gluch*, 913 F.2d 1159, 1162 (6th Cir. 1990). Because a petition for a writ of habeas corpus challenges a government custodian's authority to continue detention, an individual's release from custody after filing generally moots the petition. *Lane v. Williams*, 455 U.S. 624, 632 (1982). The Sixth Circuit has held that a petition for a writ of habeas corpus challenging the length of detention pending removal is rendered moot by removal. *Enazeh v. Davis*, 107 F. App'x 489, 491 (6th Cir. 2004) ("Enazeh's August 2003 deportation has rendered his first two claims for relief moot. Enazeh sought release from detention pending his removal from the United States and an injunction against execution of the removal order. Because he has already been deported, the court

can no longer grant the requested relief."). And, district courts have held that release on an order of supervision moots a petition challenging length of detention pending removal. *See Willix. v. Holder*, 2012 WL 463830, at *1 (W.D. Mich.) ("In his petition . . . [Petitioner] is not challenging the order requiring that he be removed from the United States. Petitioner simply requested that 'ICE release me under an order of supervision' pending his removal from the United States. Because Petitioner has obtained the relief requested in his petition, the undersigned recommends that Willix's petition be dismissed as moot."), *report and recommendation adopted by* 2012 WL 463825; *see also Garrido-Maurin v. ICE/DHS*, 2018 WL 3853706, at *3 (N.D. Ohio) (finding § 2241 petition mooted by release on order of supervision), *report and recommendation adopted by* 2018 WL 3842780; *Kahn v. Attorney General*, 2016 WL 4004616, at *2 (N.D. Ohio) ("As Petitioner has received his requested relief by being released from custody on an order of supervision, there is no longer an active case or controversy."), *report and recommendation adopted by* 2016 WL 4009885.

Petitioner was released from ICE custody on December 21, 2018. *See* Doc. 30-2, at 1 (Bernacke Dec. Decl.). Once Petitioner was released, this Court could no longer grant his request for habeas relief from his continued detention. *See Carras,* 807 F.2d at 1288 ("Mootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief."); *see also Powell v. McCormack*, 395 U.S. 486, 496 (1969) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.").

There are, however, exceptions to the mootness doctrine. In arguing his case is not moot, Petitioner cites both the "voluntary cessation" and "capable of repetition yet evading review" exceptions. The undersigned addresses each in turn below.

*Voluntary Cessation*

Petitioner contends that this case falls within the voluntary cessation exception to the mootness doctrine. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). But a case may still be moot "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). The Sixth Circuit has also noted that "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. . . . [S]uch self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988)). That said, the party arguing mootness still has a heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur. *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003). And that burden is "increased" where "voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342-43 (6th Cir. 2007). As the Ninth Circuit has explained, "[t]hough there is no bright-line rule for application of the voluntary cessation doctrine, this much is apparent: a claim is not moot if the government remains practically and legally 'free to return to [its] old ways' despite abandoning them in the ongoing litigation." *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1039 (9th Cir. 2018) (quoting *W.T. Grant Co.*, 345 U.S. at 632).

Petitioner contends that "[a]s this Court was poised to render a decision on the legality of [his] 18-month detention, Respondents suddenly and without explanation, voluntarily released him" and that they "offered no assurances that he would not be re-detained in violation of the Immigration and Nationality Act or the Due Process Clause." (Doc. 21, at 1). The Government responds that Petitioner's release from ICE detention was "mandated by regulation", and "was not done simply to deprive this Court of jurisdiction." (Doc. 34, at 3). This is so, they argue, because "after timely and exhaustive efforts to effectuate his removal, Respondents determined that . . . removal was not significantly likely in the reasonably foreseeable future" and they therefore released Petitioner as required by 8 C.F.R. § 241.13. *Id.* And, the Government contends, "the record does not demonstrate that . . . ICE acted to deprive the court of jurisdiction, acted in bad faith, or that ICE will re-detain [Petitioner] regardless of the likelihood of his removal in the reasonably foreseeable future." *Id.* at 5 (footnote omitted). Perhaps the Government paints too rosy a picture of the circumstances leading up to Petitioner's release on conditions, but Petitioner conversely paints one that is too dark. The truth lies somewhere in the middle. There were most certainly delays in the Government's attempts to remove Petitioner. But so too was there progress made, particularly in the time period directly leading up to his release. Although Petitioner contends he was released "suddenly and without explanation" (Doc. 21, at 1), another view of these same facts is that he was released after the Government's progress toward obtaining removal stalled.

Importantly, the Government does not "remain[]practically and legally 'free to return to [its] old ways' despite abandoning them in the ongoing litigation." *Fikre*, 904 F.3d at 1039 (quoting *W.T. Grant Co.*, 345 U.S. at 632). Instead, having released Petitioner pursuant to 8 C.F.R.

241.13, the Government may not re-detain Petitioner without satisfying 8 C.F.R. § 241.13(i). That

regulation provides when a previously-released detainee may be re-detained:

> (i) Revocation of release—
>
> (1) Violation of conditions of release. Any alien who has been released under an order of supervision under this section who violates any of the conditions of release may be returned to custody and is subject to the penalties described in section 243(b) of the Act. In suitable cases, the HQPDU shall refer the case to the appropriate U.S. Attorney for criminal prosecution. The alien may be continued in detention for an additional six months in order to effect the alien's removal, if possible, and to effect the conditions under which the alien had been released.
>
> (2) Revocation for removal. The Service may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future. Thereafter, if the alien is not released from custody following the informal interview provided for in paragraph (h)(3) of this section, the provisions of § 241.4 shall govern the alien's continued detention pending removal.
>
> (3) Revocation procedures. Upon revocation, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

8 C.F.R. § 241.13(i). Therefore, absent a violation of his conditions of release, or "changed

circumstances" demonstrating a "significantly likelihood that [he] may be removed in the

reasonably foreseeable future", Petitioner may not be re-detained.[6]

---

6. Petitioner contends that "the government has not provided this Court with any assurances that it will not re-detain Dr. Ashqar absent a triggering event that authorizes his re-detention, like new factual circumstances that actually make his removal significantly likely in the very near future" (Doc. 32, at 5). In essence, Petitioner asks the Government to assert it will follow the law. But 8 C.F.R. § 241.13(i) provides those guidelines, as the Government acknowledges. *See* Doc. 34, at 7 ("ICE thereby subjected itself to the legal requirements of 8 C.F.R. § 241.13(i) should [Petitioner]

The undersigned finds *Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003)—cited by Petitioner—distinguishable from the instant case. There, the petitioner was paroled under 8 C.F.R. § 212.12 ("Parole determinations and revocations respecting Mariel Cubans"). *Id.* at 395. The Sixth Circuit held that the voluntary cessation exception to mootness applied because the petitioner's "immigration parole [could] be revoked by the INS at any time for almost any reason". *Id.* The applicable regulation governing parole there provided:

> (h) Revocation of parole. The Associate Commissioner for Enforcement shall have authority, in the exercise of discretion, to revoke parole in respect to Mariel Cubans. A district director may also revoke parole when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Associate Commissioner. Parole may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (1) The purposes of parole have been served;
>
> (2) The Mariel Cuban violates any condition of parole;
>
> (3) It is appropriate to enforce an order of exclusion or to commence proceedings against a Mariel Cuban; or
>
> (4) The period of parole has expired without being renewed.

8 C.F.R. § 212.12. Thus, in *Rosales-Garcia*, "the INS [could] revoke Rosales's parole at any time and ha[d] in fact revoked Rosales's parole twice in the past fifteen years." 322 F.3d at 397. As such, the Sixth Circuit held the voluntary cessation exception applicable, and without a statement making it "absolutely clear" that potentially indefinite detention by INS could not reasonably be expected to recur, the case was not moot. 322 F.3d at 397.

---

be re-detained at some point in the future."). And the Court would caution the Government that given the lengthy nature of Petitioner's post-removal detention prior to his December 2018 release (over eighteen months), were Petitioner to be re-detained pursuant to 8 C.F.R. § 241.13(i)(2) and bring a subsequent habeas Petition, this Court (and presumably any other) would exactingly scrutinize the nature of any cited "changed circumstances."

Here, by contrast, Petitioner may only be re-detained if he violates a condition of release, or "changed circumstances" demonstrate a "significantly likelihood that [he] may be removed in the reasonably foreseeable future". 8 C.F.R. § 241.13. While Petitioner is correct that this requires some level of judgment on behalf of government officials, it still requires a showing of *different* circumstances than existed at the time of his release and is far more concrete than a determination that parole may be revoked "when, in the district director's opinion, revocation is in the public interest". 8 C.F.R. § 212.12(h).[7]

Therefore, the undersigned finds *Rosales-Garcia* (as well as the other cases cited by Petitioner) distinguishable, and no such statement regarding re-detention is required. In accord with judges in another district court to repeatedly consider this issue, the undersigned recommends the Court find the voluntary cessation exception to mootness inapplicable in these circumstances. *See Danh Thay v. Nielsen*, 2018 WL 3979684, at *3 (D. Minn.) ("[I]f Petitioner were to be brought back into custody, it would be under a new set of circumstances and facts, and [it] would be impossible for the government to repeat the *same* unlawful conduct that [Petitioner] challenged, and thus this case does not fall into the voluntary-cessation exception to the mootness doctrine.") (internal quotation and citation omitted) *report and recommendation adopted sub nom. Thay v. Nielsen*, 2018 WL 3978123; *Mohamed v. Sessions*, 2017 WL 4417706, at *6 (D. Minn.) ("In the absence of evidence suggesting that a detention of Mohamed on similar facts is reasonably likely to occur again, this Court cannot find that the voluntary-cessation exception applies."), *report and recommendation adopted by* 2017 WL 4410765; *Kargbo v. Brott*, 2016 WL 3676162, at *2 (D.

---

7. Similarly, the other cases cited by Petitioner address release under regulations different than those at issue here. *See Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011) (addressing individuals detained under 8 U.S.C. § 1231(a)(6) and their entitlement to bond hearings); *Rodriguez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010) (discussing release premised on 8 C.F.R. § 241.4); *Picrin-Peron v. Rison*, 930 F.2d 773 (9th Cir. 1991) (discussing release premised on 8 C.F.R. § 241.4).

Minn.) ("[T]his is not a case in which the government voluntarily ceased allegedly unlawful conduct but is free to restart such conduct at whim. To the contrary, by releasing Kargbo under 8 C.F.R. § 241.13, the government has placed itself under new legal limitations—limitations that did not exist at the time that Kargbo filed his habeas petitions and that make it impossible for the government to resume the objectionable conduct."). Put plainly, Petitioner challenged his post-order-of-removal detention. Should he be re-detained, it will be under 8 C.F.R. § 241.13. Thus, there is no reasonable expectation Petitioner will again suffer the same harm initially alleged. *See Friends of the Earth*, 528 U.S. at 190; *Mosley*, 920 F.2d at 415.

In conclusion, the undersigned recommends the Court find the "voluntary cessation" exception to mootness does not apply here.[8]

*Capable of Repetition Yet Evading Review*

Petitioner also argues his renewed motion for discovery (and the underlying action itself) is not moot because his detention is "capable of repetition, yet evading review." *See* Doc. 24, at 2 n.1; Doc. 31, at 1. "An exception to the mootness doctrine is found in exceptional circumstances

---

8. Petitioner argues that Respondents are not entitled to the "solicitude" governing self-correction by government officials, *Mosley*, 920 F.2d at 415, in this case because they have, in essence, acted in bad faith by continuing Petitioner's detention. In so arguing, Petitioner points to two things. First, that the Government's principal fact witness, Mr. Bernacke, was found by another district judge to have made "demonstrably false" statements regarding the foreseeability of removal of other individuals. (Doc. 32, at 7 n.2) (citing *Hamama v. Adducci*, 349 F. Supp. 3d 665, 677 (E.D. Mich. 2018)). Second, he argues Mr. Bernake "may well have made false or misleading statements in this very case" and "there is evidence in the record that ICE detained Dr. Ashqar for impermissible reasons unrelated to the foreseeability of his removal." (Doc. 32, at 7) (citing Doc. 25-2) based on an attached declaration from his former attorney, Denyse Sabagh recounting a conversation she had with ICE Deportation Officer Aaron Roby in October (Doc. 25-2, at 1) (stating Officer Roby told her he recommended Petitioner's release on, but the Deputy Field Office Director did not agree and determined Petitioner should remain in custody "citing his criminal convictions and high profile and the wording of the conviction suggested he assisted Hamas."). Having reviewed both Mr. Bernacke's testimony and Ms. Sabagh's declaration, the undersigned does not find Mr. Bernacke misled the Court in this case or that the current record indicates the Government acted in bad faith.

21

where an appeal presents an issue capable of repetition but evading review." *Enazeh*, 107 F. App'x at 491 (citing *Weinstein v. Bradford,* 423 U.S. 147, 148-49 (1975)). This exception applies only where: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein*, 423 U.S. at 149.

For much the same reasons discussed above regarding voluntary cessation, the undersigned disagrees that this case falls within this exception. First, as another court succinctly explained, Petitioner's exact situation is not capable of repetition:

> Petitioner was released because there was no significant likelihood of his removal in the reasonably foreseeable future. If Petitioner were to be taken back into custody, it would be based on a new set of facts and circumstances, which, for purposes of example and not limitation, could be due to travel documents being issued for Petitioner's removal to Vietnam. If Petitioner were brought back into custody, he would be free to bring a new habeas petition based on such new facts and circumstances. Accordingly, the conduct at issue does not meet the capable-of-repetition-yet-evading-review exception because the allegedly unlawful detention on which the Petition is based cannot be repeated under the same circumstances.

*Danh Thay*, 2018 WL 3979684, at *2 (internal citation omitted), *report and recommendation adopted sub nom. Thay v. Nielsen*, 2018 WL 3978123; *see also Kargbo*, 2016 WL 3676162, at *2 ("In other words, the new detention will not be a "repeat" of either of the detentions that Kargbo challenged in his habeas petitions; it will be a different type of detention that will be based on a different justification.") Similarly here, if Petitioner is re-detained, the law requires it be due to changed factual circumstances with related to the likelihood of removal, or a violation of conditions. *See* 8 C.F.R. § 241.13(i).

Further, even to the extent that Petitioner's claims are capable of repetition should he be re-detained, they will not evade review. As noted above, Petitioner would then be free to bring a new habeas petition based on such new facts and circumstances. The undersigned therefore finds

this case is not "capable of repetition, yet evading review" where there is no indication that the Government has released Petitioner with the intention of later rescinding that release, simply to evade review by the Court.

To be clear, should Petitioner's fears be realized and he be re-detained, the Court notes that it (and presumably any other court) would view any "changed circumstances" cited by the Government with an exacting, critical eye, given the lengthy detention (and repeatedly unsuccessful removal attempts) prior to Petitioner's current release on conditions.

Discovery Motion

Prior to the evidentiary hearing, Petitioner filed a Motion for Expedited Discovery (Doc. 13), which the undersigned denied without prejudice (Doc. 16). After the hearing, Petitioner renewed his motion (Doc. 25), and it was fully briefed (Docs. 28, 31). The motion itself contends it is "a narrow request for a small universe of documents that will help the Court assess the likelihood of Dr. Ashqar's removal in the reasonably foreseeable future and test the veracity of the government's perpetually and unreasonably optimistic claims that Dr. Ashqar's removal is imminent." (Doc. 25-1, at 1). In his reply, filed after his release, Petitioner argues the motion is not moot, and again cites the voluntary cessation and "capable of repetition, yet evading review exceptions". (Doc. 31, at 1).

Also in Reply, Petitioner argues "[s]hould ICE re-detain Dr. Ashqar, it will likely be vital to any challenge he may mount to the lawfulness of such redetention to know why ICE detained him for so long this time around, and what the governments of Jordan and Israel, and the Palestinian Authority have communicated to ICE regarding his repatriation." (Doc. 31, at 3). But Petitioner's own language demonstrates he seeks this information to combat a future hypothetical

detention. He requests discovery for the purpose of "any challenge he *may* mount" "*should* ICE re-detain" him. (Doc. 31, at 3).

Because Petitioner has been released, the undersigned recommends the Court find the discovery motion also moot.[9] For the same reasons discussed above, the undersigned finds the mootness exceptions inapplicable under the present circumstances. Should Petitioner be re-detained, he would certainly be free to raise his discovery arguments again.

<u>Request for Injunctive Relief</u>

Finally, in his Petition, and in his opposition to Respondents' motion, Petitioner further contends this Court should enjoin Respondents from re-detaining him without court approval. (Doc. 1, at 14; Doc. 32, at 2, 9-11).

As set forth above, federal courts are limited by Article III, Section 2 of the Constitution to considering cases or controversies. "One element of the case-or-controversy requirement" is that Petitioner "must establish that [he has] standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To support Article III standing, Petitioner must show an "injury in fact", that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted). Petitioner must show—among other things— that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations and citations omitted). Moreover, Petitioner "must

---

9. Although Magistrate Judges have authority to rule on pretrial motions related to discovery, because the discovery ruling herein is dependent upon the Court's adoption of the recommendation related to the Motion to Dismiss, the undersigned offers it as a recommendation, rather than as an order.

demonstrate separate standing to seek declaratory or injunctive relief focused on prospective harm." *Barber v. Miller*, 809 F.3d 840, 849 (6th Cir. 2015) (citing *O'Shea v. Littleson*, 414 U.S. 488, 495-96 (1974)). In so doing, Petitioner must show that "the threatened injury is 'certainly impending' or that there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Despite Petitioner's protestations to the contrary, the undersigned finds any future detention is, at this stage, purely "conjectural or hypothetical" *Lujan*, 504 U.S. at 560, and not "certainly impending", *Clapper*, 568 U.S. at 409. As such, Petitioner lacks standing to seek the requested relief.

Furthermore, Petitioner's claim is not yet ripe. "The ripeness doctrine serves to avoid premature adjudication of legal questions and to prevent courts from entangling themselves in abstract debates that may turn out differently in different settings." *Warshak v. United States,* 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (quoting *Nat'l Park Hospitality Ass'n v. Dept. of Interior,* 538 U.S. 803, 807 (2003) (internal brackets and ellipsis omitted)). Ripeness is essentially "a question of timing" and advises "against resolving a case that is anchored in future events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272, 284 (6th Cir. 1997). The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Warshak,* 532 F.3d at 525 (quoting *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808). A claim is not "fit" for judicial review when there is no certainty whether the challenged conduct will occur in the future. *Id.* 526 (citing *Tex. v. United States,* 523 U.S. 296, 300 (1998) (holding that a claim is not ripe where it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all")) "Answering

difficult legal question before the arise and before the courts know how they will arise is not the way we typically handle constitutional litigation." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 894 (1990)).

The Court cannot predict the circumstances of any future, hypothetical, detention, and thus it would be improper to make a ruling regarding any such detention. *See, e.g., Lin v. Lynch*, 2016 WL 1253265, at *2 (C.D. Cal.) ("[A]lthough Petitioner seeks an injunction preventing Respondents from again detaining him, a challenge to any future detention is not yet prudentially ripe. . . Indeed, the Court cannot now determine whether any future detention of Petitioner will violate the holding in *Zadvydas*, as Petitioner claims, because circumstances may change and the likelihood of Petitioner's removal may become reasonably foreseeable.")

The undersigned also declines Petitioner's invitation (Doc. 32, at 10-11) to recommend this Court use its equitable powers to "creatively fashion[]" relief and issue such an injunction. Any future detention is at this point entirely hypothetical. Should Petitioner's fears be realized and he be re-detained in a manner he believes violates the Constitution, the issue may be raised at that time.

There is no doubt that Petitioner's post-removal order detention was lengthy. Whatever flaws in the process, and whatever recommendation the undersigned may have made regarding Petitioner's continued detention had it continued are not questions this Court can or should answer at this juncture. Petitioner's release has rendered these questions moot.

## CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the Court recommends Respondents' Motion to Dismiss (Doc. 30) be GRANTED; and Petitioner's Renewed Motion to Compel Discovery (Doc. 25) be DENIED as MOOT.

s/ James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).